## GLENN-TUCKER, et al, vs CLAYTON, Judge.

1. *Mandamus—Petition for—Sufficiency of.*

   In a petition for a mandamus to compel a judge to try the cause of petitioners upon their application for enrollment as citizens of the Choctaw Nation, it was alleged that their petition of enrollment, filed with the Dawes Commission was, by that Commission, rejected; upon appeal to the U. S. Court for Central District the decision was adverse and their appeal to the U. S. Supreme Court was dismissed. Held, that such petition stated no ground for the granting of the writ.

2. *Trial—Disqualification of Judge—Hearing Before Jude of Another District.*

   Act of March 1, 1895, (28 Stat. 694) provides that the judge of each district in Indian Territory is empowered to hold court for the trial of a case in any other district when the judge of usch other district is disqualified from trying such case. It was, therefore, not improper for the judge of the Central District being disqualified in a certain cause, ao request another judge to come to said district and hear said cause.

Original petition for a mandamus by John C. Glenn-Tucker and others againstWilliam H. H. Clayton, as judge of the United States court for the Central district of the Indian Territory, to compel respondent to hear the cause of petitioners on their application for enrollment as citizens of the Choctaw Nation. Dismissed.

The plaintiffs made application to the Dawes commission for enrollment as citizens of the Choctaw Nation. From a judgment of the commission rejecting the application they appealed to the United States court for the Central district of the Indian Territory. This court affirmed the judgment of the commission in an opinion given by William M. Springer, judge of the United States court for the Northern district of the Indian Territory, presiding in place of the judge of the Central district, who was disqualified from hearing the cause, as follows:

"The Choctaw Nation, by its attorneys, appeared before the United States commission to the Five Civilized Tribes, before which commission this case was pending, and filed a plea to the jurisdiction of the commission. Among other things stated in this plea of the Choctaw Nation is the following: 'Plaintiffs ought not to be admitted as citizens, because their claim has already been presented to the Choctaw council and refused; and because they prosecuted an appeal from said council to the Indian agent, and from said Indian agent to the secretary of the interior, and said appeal was decided against them. The Indian agent, Robert L. Owen, and the secretary of the interior, through his assistant attorney general, affirmed the decision of the Choctaw council.' It appears from the papers filed in this case that the claimants base their right to citizenship in the Choctaw Nation upon the ground that they are descendants of Abigail Rogers, who is alleged to have been born of a Choctaw mother somewhere in the old Choctaw Nation or that they have intermarried with her descendants. In the opinion of Robert L. Owen, United States Indian agent, on the appeal taken by plaintiffs from the decision of the Choctaw council, it is stated that by agreement the claimants of the various descendants of Abigail Rogers were consolidated. Mr. Owens, in his elaborate opinion in this case, reviews the testimony of the witnesses, and reaches the conclusion 'that it is a matter

of question whether Abigail Rogers, born in 1760, was of Choctaw blood,' and concludes his report as follows: "The claimants have lived in various states, voted, paid taxes, and exercised other acts of citizenship, and now ask, on the theory that Abigail Rogers, who was born 120 years ago, as they believe, of a Choctaw mother, that the United States declare that they are entitled to Choctaw citizenship. In my opinion, even if it were established that Abigail Rogers were a full-blood Choctaw, and her descendants had for a long period of time, certainly several generations, severed their connection with the Choctaw Nation, and exercised the acts of citizenship as United States citizens, which they undoubtedly were, that even in that event they would not be entitled to come into the Choctaw Nation and by virtue of their attenuated blood demand a citizenship, which by their own acts, they had forfeited. If such a theory were true, a few Abigail Rogerses could consume the Choctaw Nation, and perhaps some other Choctaw more remote by a century could furnish 5000 descendants of almost pure white blood to enter the Choctaw Nation, demanding and exercising the rights of citizenship there; and that it would seem that (while this remote relationship might afford the Choctaw Nation ground for adopting persons connected with them by blood) the only just and proper way by which such forfeited rights might be restored would be by voluntary adoption of the community from which their ancestors have severed themselves. The decision of the Choctaw council, therefore, in refusing the petition of this family, is affirmed.'

"From the decision of Indian Agent Owen an appeal was taken to the secretary of the interior. George H. Shields, assistant attorney general for the interior department, submitted an elaborate opinion in the case, which received the approval of the secretary of the interior. The opinion of Mr. Shields was dated June 24, 1890. On March 16, 1895, this opinion was

(34)

approved by the then secretary of the interior.   From the opinion of Assistant Attorney General Shields the following facts were obtained:   That the Choctaw National Council passed an act October 21, 1882, the second and third sections of which are as follows:

"'Sec. 2. That the secretary of the interior is hereby requested to order the United States Indian agent to hear and determine all applications made to him to establish claims of citizenship in the Choctaw Nation, and the decision of such agent shall be final: provided only, that all such applications shall have been made to the proper Choctaw tribunal and by it refused the agent notifying the principal chief of the time and place of such rehearing.

"'Sec. 3. That the secretary of the interior is further requested to instruct the United States Indian agent to order all noncitizens now in the nation to take immediate steps to prove their rights as citzens, and if they refuse or neglect remove them beyond the limits of the Choctaw Nation.'

"Report of Commissioner of Indian Affairs, 1884, p. 43.

"A copy of this act was forwarded to the secretary, upon receipt of which Secretary Teller, on March 5, 1884, required the decision of the Indian agent to be submitted to the interior department for revision.   In pursuance of the approval of the secretary on March 22, 1884, the United States Indian agent in the Indian Territory was instructed by the commissioner of Indian affairs as follows: 'Notify all disputed claimants to citizenship in the Choctaw Nation whose names are furnished you by the Choctaw authorities to appear at the next session of the proper tribunal, and submit their claims for adjudication as provided by the Choctaw laws; that, failing to do so, they will be deemed intruders, and removed from the territory; and that

any party feeling aggrieved by the decision of the Choctaw tribunal will be allowed thirty days in which to appeal to you, at the expiration of that time to be deemed an intruder, if no appeal be taken." In pursuance of these instructions the Indian agent caused a number of parties to be notified; among whom were John C. Glenn-Tucker and others, who are claimants in this case. These parties appeared before the Choctaw council, and on November 6, 1884, their claims to citizenship in the Choctaw Nation were rejected. From this rejection they appealed to the United States Indian agent on December 2, 1884. In the opinion of Assistant Attorney General Shields is the following statement: 'Inasmuch as they claimed from a common ancestor, one Abigail Rogers, said appeals were consolidated. A good deal of testimony was taken, mostly by the appellants, and in August, 1887, Robert L. Owen, the U. S. Indian agent, gave judgment sustaining the decision of the Choctaw council." The papers were transmitted to the commissioner of Indian affairs, who sent them to the interior department with the approval of the judgment of Agent Owen. The papers were afterwards withdrawn, and on March 5, 1889, the commissioner of Indian affairs reversed his former action approving Agent Owen's decision, and sustained the appeal of Glenn and others. United States Indian agent Leo E. Bennett, in a communication to the Indian bureau on April 11, 1890, asked for instructions as to what course he should take in regard to these claimants. He informed the department that the Choctaw Nation had declared Glenn and his associates to be intruders, and had requested their removal; that the claimants declined to leave the territory and insisted that they were citizens of the Choctaw Nation. At the request of the attorney for the Choctaw Nation the secretary of the interior requested the commissioner of Indian affairs to transmit the record in the case to him. Two questions were submitted to the secretary of the interior by the commissioner of Indian affairs, as follows: 'First, as to whether the

action taken by the commissioner of Indian affairs in his letter of March 5, 1889, to the United States Indian agent, was with proper authority, and operates as remanding the case for proceedings de novo before the Choctaw authorities; and, if not, second, as to whether, upon the record presented, which was discussed in office report of October 4, 1887, before referred to, the claimants, Glenn-Tucker, et al., have established their rights to citizenship in the Choctaw Nation.' 'To these questions Assistant Attorney General Shields submitted the following answers: 'The case being one thus clearly within the jurisdiction of this department, it was proper for the commissioner, who is especially charged with the supervision of Indian affairs, to have expressed his views upon the report of the United States Indian agent in transmitting the same to this department. The commissioner's duty was discharged when he did this. The subsequent withdrawal of the papers from the files of this department, and his reversal of the action of the Indian agent, was not only irregular, but was without proper lawful authority, if for no other reason because the matter had then passed beyond the commissioner's jurisdiction. It is therefore my opinion that this action of Commissioner Oberly should be treated as a nullity, and the case determined on its merits, just as it stood in this department before his irregular proceedings.' It is unnecessary to quote all the statements in this opinion. From it, however, we gather the facts following: That Glenn and some of his associates were notified by the United States Indian agent in June 1884, to appear before the Choctaw council; that on October 23, 1884, a petition sworn to by John C. Glenn, and addressed to the Choctaw council was filed with the national secretary, wherein that body was asked to grant unto him and his family all the rights and privileges of citizenship in the Choctaw Nation'; that on the report of the committee of the council on November 6, 1884, the petition was denied. and the claim rejected by that body; that on December 2, 1884, certain of the parties appealed

to the United States Indian agent from the action of the council; that in October, 1886, a paper was filed in the office of the Indian agent wherein it was agreed that the cases of all those who asserted descent from Abigail Rogers should be consolidated and considered as one case. Additional testimony was taken and submitted in behalf of claimants to the United States Indian agent, upon which, and that already in the case, he rendered a judgment adverse to the petitioners.

"As to the second question stated above,—as to whether Glenn and his associates had established their right to citizenship in the Choctaw Nation,—Assistant Attorney General Shields held that all the parties in question claim their descent from one Abigail Rogers; that it was the general repute in the family that Abigail Rogers was the child of a white man and a Choctaw woman, name unknown; that upon the birth of Abigail, about 1760, she was taken by her father to the Cherokee Nation, where she remained until she grew up, and where she married a white man by the name of John Glenn, who subsequently removed with her to Mississippi, where they lived a part of the time with the Choctaws and a part of the time with the Chickasaws. She had nine children by Glenn. Mr. Shield traces her history and that of her descendants, as shown by the testimony in the case, which it is not necessary to here reproduce. It appears that she died in Carroll county, Arkansas, about 1840. Her descendants have become scattered around,—some in Tennessee, some in Mississippi, in Missouri, Texas, and Arkansas,—but a number of them, principally from Arkansas, have gathered into the Choctaw Nation, where they hold possession of lands, claiming to do so by right of their Indian descent. They base their right to citizenship in the Choctaw Nation upon the ground that they are descendents of Abigail Rogers. Mr. Shields found the names of about 175 of these descendants in the record at that time, but that those by no

means included all. The department was not passing upon the case of Abigail Rogers,—she had been dead 50 years—but upon the case of her alleged descendants of the third, fourth and fifth generations, 1-16, 1-32, or 1-64 part of Indian blood, and alleging that their claim to citizenship had been improperly rejected by the nation. Mr. Shields concluded by stating that he had no hesitation in giving it as his opinion that the claim of said parties to Indian citizenship would be rejected. This opinion was approved by Secretary Noble at the time, June 24, 1890, and also by Hoke Smith on January 23, 1895. John I. Hall, who was assistant attorney general of the interior department at the time, examined the case, thoroughly. Referring to the opinion of Assistant Attorney General Shields, he said: 'That opinion gives a full history of the case, examines it exhaustively, and arrives at the conclusion that said parties are not unjustly or improperly refused admission to citizenship by the authorities of the Choctaw Nation. In this conclusion, on the facts stated I concur, and do not deem it necessary to do more than to refer to that opinion as containing the reasons which bring me to this determination.' Mr. Hall further stated: 'Secretary Noble accepted the opinion of Assistant Attorney General Shields as conclusive in the premises, and directed that said parties be removed from the Choctaw Nation as intruders.' He gave it as his opinion that his predecessor, Mr. Shields, correctly stated the law and the facts in the case, and that his opinion should be accepted as conclusive thereon. Owing to interposition of counsel for claimants, the matter has remained unsettled until this time. The claimants applied to the United States commission to the Five Civilized Tribes to be enrolled as citizens of the Choctaw Nation. The commission rejected their claims to citizenship, and they have appealed to this court.

"The Choctaw Nation interposes the same objection in this court to the admission of the claimants that was interposed before the United States commission, namely, that their claim

had already been determined adversely by the Choctaw council. The counsel for the claimants in this case, in his brief, concedes 'that the rule of res adjudicata is to the effect that a decision of a court of competent jurisdiction is and ought to be a final and conclusive settlement of the question involved in any particular controversy as to the parties concerned therein, and as to any title claimed through and under those parties, so that, if any fact has once been directly tried and determined by such court, the same parties cannot be allowed to contest the same matter either in that court or in any other.' Provided the court acted within the proper limits of its jurisdiction. Counsel for claimants contends 'that the decision relied upon in this case was not that of a court, or any person possessing any judicial authority, or competent under the constitution and laws of the United States to be clothed with any such authority, but was the act of a merely executive or administrative officer of the United States, who, in the exercise of a discretionary power, incidentally passed upon the question now directly in issue in the present case.' Numerous authorities are cited by counsel to establish the proposition that the decisions of executive officers do not come within the rules governing former adjudications, and that the opinions of the Indian agent and of the secretary of the interior in this case cannot be pleaded an estoppel of the claimants' rights to citizenship in the Choctaw Nation. In the opinion of this court, this contention is tenable. If there were no other decisions affecting the claimants' rights to citizenship than those of the Indian agent and of the secretary of the interior, the plea of res adjudicata would not be well taken. It is conceded that under the direction of the interior department, and in pursuance of the laws of the Choctaw Nation, the claimants made application to the Choctaw council to be admitted to citizenship in that nation. Their claim was referred to a committee, was duly considered, and the council of the nation on November 6, 1884, decided adversely to claimants,

rejecting their claim to citizenship in the nation, and that by a subsequent act of the council the claimants were declared to be intruders. This raises the question as to whether the acts of the Choctaw council in passing upon applications for citizenship are binding upon this court.

"Some Faith and Credit.

"The United States court of appeals for the Eighth circuit and the Supreme Court of the United States have in several recent and important cases passed upon the relations which exist between the Five Civilized Tribes and the United States and in each of these cases it has been held, that the proceedings and judgments of the courts of the several nations in the Indian Territory are on the same footing with proceedings and judgments of the courts of the territories of the Union, and are entitled to the same faith and credit. The case of Mehlin, et al, against Ice was decided by the court of appeals for the Eighth circuit May 1, 1895. This case was appealed from the United States court in the Indian Territory. In this case Caldwell, circuit judge, speaking for the court, and pronouncing its unanimous opinion, said: 'The right of local self-government has always been claimed and exercised by the Cherokee Nation, and their rights in this regard, so far as relate to their own country and people, have never been questioned by the United States.' Mehlin vs Ice, 5 C. C. A. 403, 56 Fed. 17. Referring to the social and political conditions in the Cherokee Nation, Judge Caldwell in that case said: 'The social and political condition in the Cherokee Nation is imperfectly understood by many. By intermarriage with the whites, they have to a considerable extent come to be of mixed blood. Generations ago they abandoned the chase and the warpath, and adopted the pursuits of civilized men. As far back as 1827 they adopted a written constitution, modeled after the constitutions of the

states then surrounding their country. Their state of civiliza-
tion at that time may be inferred from the following provisions
of the constitution: "No person who denies the being of God,
or a future state of rewards and punishments, shall hold any
office in the civil department of this nation." "Religion,
morality, and knowledge being necessary to good government,
the preservation of liberty, and the happiness of mankind,
schools and means of education shall forever be encouraged in
this nation." Sections 2, 10, art. 6, Const. 1827.' We quote
further from that opinion as follows: "These articles were re-
tained in the constitution of 1839. In furtherance of the article
on the subject of education the national council has, from time
to time, passed laws to establish and maintain common schools
and seminaries in the nation, and their opportunities for religious
instruction have not been at all inferior to those of frontier
white settlements. Under their constitution, the government,
like that of the states, is divided into three departments,—legis-
lative, executive and judicial,—and the functions and jurisdic-
tion of each of these departments is as well defined as it is in
the constitutions of the states. Their judicial system is also
modeled after that of the states, and business is conducted in
their courts in the same orderly manner.' We conclude our
quotation from this opinion with the following: 'The proceedings
and judgments of the courts of the Cherokee Nation in cases
within their jurisdiction are on the same footing with proceed-
ings and judgments of the courts of the territories of the Union,
and are entitled to the same faith and credit.' In the case of
Exendine vs Pere, 6 C. C. A. 112, 56 Fed. 777, appealed from the
United States court in the Indian Territory, the circuit court of
appeals for the Eighth circuit reaffirmed the doctrine laid down
in Mehlin vs Ice, 5 C. C. A. 403, 56 Fed. 17. In the case of
Standley vs Roberts, 8 C. C. A. 305, 59 Fed. 836, appealed from
the United States court in the Indian Territory, the circuit
court of appeals for the Eighth circuit handed down an opinion

January 29, 1894, in which the rule laid down in Mehlin vs Ice was expressly adopted and followed. In the case of Talton vs Mayes, 163 U. S. 376-385, 16 Sup. Ct. 986, 41 L. Ed. 196; the Supreme Court of the United States held that a crime of murder committed by one Cherokee Indian upon the person of another within the jurisdiction of the Cherokee Nation is not an offense against the United States, but an offense against the local laws of the Cherokee Nation; and the statutes of the United States which provide for an indictment by a grand jury, and the number of persons who shall constitute such a body, have no application This was a very important case, and deserves special consideration at this time.    In that case a petition for habeas corpus was filed in the district court of the United States at Ft. Smith on the 15th day of February, 1893, by one Talton, who had been convicted in the Cherokee courts on a charge of murder, and sentenced to be hanged. The case was taken to the supreme court of the United States. The contention of the petitioner was that he had been deprived of his liberty without due process of law; that he was in confinement in contravention of the constitution and laws of the United States, and also in violation of the constitution and laws of the Cherokee Nation. These contentions rested upon the averment that the indictment under which he had been tried and convicted was void because returned by a body consisting of five grand jurors, which was not only an insufficient number to constitute a grand jury under the constitution and laws of the United States but was also wholly inadequate to compose such jury under the laws of the Cherokee Nation, which, it was alleged, provided for a grand jury of thirteen. The petitioner, moreover, averred that he had not been tried by a fair and impartial jury, and that many gross irregularities and errors to his prejudice had been committed on the trial. The petition was heard before Judge Parker, who remanded him to the Cherokee authorities, and the case was pending on appeal to the supreme court of the United States,

which affirmed Judge Parker's decision. We call especial attention to the following quotation from the opinion of the supreme court of the United States in this case: 'A decision as to the merits of these contentions involves a consideration of the relation of the Cherokee Nation to the United States, and of the operation of the constitutional provisions relied on upon the purely local authorities of that nation. By treaties and statutes of the United States the right of the Cherokee Nation to exist as an autonomous body, subject to the paramount authority, of the United States, has been recognized. And from this fact there has consequently been conceded to exist in that nation power to make laws defining offenses and providing for the trial and punishment of those who violate them when the offenses are committed by one member of the tribe against another one of its members within the territory of the nation.' The supreme court then quote the fifth article of the treaty of 1853 (7 Stat. 478-481) between the United States and the Cherokee Nation, and add: 'This guaranty of self-government was reaffirmed in the treaty of 1866 (14 Stat. 799, 803), the thirteenth article of which reads as follows: "Art. 13. The Cherokees also agree that a court or courts may be established by the United States in said territory, with such jurisdiction and organized in such manner as may be prescribed by law: provided, that the judicial tribunals of the nation shall be allowed to retain exclusive jurisdiction in all civil and criminal cases arising within their county in which members of the nation, by nativity or adoption, shall be the only parties, or where the cause of action shall arise in the Cherokee Nation, except as otherwise provided in this treaty." The court then quotes section 30 from the act of May 2, 1890, and also section 31 of the same act, relating to the Indian Territory. These sections are well known in the Indian Territory providing as they do that the courts of the several nations shall have exclusive jurisdiction over all cases arising wherein members of the same nation, whether by blood or adoption, are the sole

parties. We quote further from the opinion of the supreme court as follows: 'The question, therefore, is, does the fifth amendment to the constitution apply to the local legislation of the Cherokee Nation, so as to require all prosecutions for offenses committed against the laws of that nation to be initiated by a grand jury organized in accordance with the provisions of that amendment? The solution of this question involves an inquiry as to the nature and origin of the power of local government exercised by the Cherokee Nation, and recognized to exist in it by the treaties and statutes above referred to. Since the case of Barron vs Baltimore, 7 Pet. 243, 8 L. Ed. 672, it has been settled that the fifth amendment to the constitution of the United States is a limitation only upon the powers of the general government; that is, that the amendment operates solely on the constitution itself by qualifying the powers of the national government which the constitution called into being. To quote the language of Chief Justice Marshall, this amendment is limitative of the "powers granted in the instrument itself, and not of distinct governments framed by different persons and for different persons." If these propositions be correct, the fifth amendment must be understood as restraining the power of the general government not as applicable to the states. The cases in this court which have sanctioned this view are too well recognized to render it necessary to do more than merely refer to them. Fox vs Ohio, 5 How. 410, 424, 12 L. Ed. 213; Withers vs Buckley, 20 How. 84, 15 L. Ed. 816; Twitchell vs Com., 7 Wall. 321, 19 L. Ed. 223; Edwards vs Elliott, 21 Wall. 532, 557, 22 L. Ed. 487; Pearson vs Yewdell, 95 U. S. 294, 296, 24 L. Ed. 436; Davis vs Texas, 139 U. S. 651, 11 Sup. Ct. 675, 35 L. Ed. 300. The case in this regard therefore depends upon whether the powers of local government exercised by the Cherokee Nation are federal powers created by and springing from the constitution of the United States, and hence controlled by the fifth amendment to that constitution, or whether they are local powers

not created by the constitution, although subject to its general provisions and the paramount authority of congress. The repeated adjudications of this court have long since answered the former questions in the negative. In Cherokee Nation vs Georgia, 5 Pet. 1, 8 L. Ed. 25, which involved the right of the Cherokee Nation to maintain an original bill in this court as a foreign state, which was ruled adversely to that right, speaking through Mr. Chief Justice Marshall, this court said (page 16): "Is the Cherokee Nation a foreign state, in the sense in which that term is used in the constitution? The counsel for the plaintiff have maintained the affirmative of this proposition with great earnestness and ability. So much of the argument as was intended to prove the character of the Cherokees as a state as a distinct political society separated from others, capable of managing its own affairs and governing itself, has, in the opinion of the majority of the judges, been completely successful. They have been uniformly treated as a state from the settlement of our country, The numerous treaties made with them by the United States recognize them as a people capable of maintaining the relations of peace and war, of being responsible in their political character for any violation of their engagements, or for any aggression committed on the citizens of the United States by any individual of their community. Laws have been enacted in the spirit of these treaties. The acts of our government plainly recognize the Cherokee Nation as a state, and the courts are bound by those acts." It cannot be doubted, as said in Worcester vs Georgia, 6 Pet. 515, 559, 8 L. Ed. 483, that prior to the formation of the constitution treaties were made with the Cherokee tribes by which their autonomous existence was recognized. And in that case Chief Justice Marshall also said (page 559): "The Indian nations had always been considered as distinct, independent political communities, retaining their original natural rights. * * * The term 'nation,' so generally applied to them means a 'people distinct from others.' The

constitution, by declaring treaties already made as well as those
to be made to be the supreme law of the land, has adopted and
sanctioned the previous treaties with the Indians nation, and
consequently admits their rank among those powers who are
capable of making treaties." In reviewing the whole subject
in U. S. vs Kagama, 118 U. S. 375, 6 Sup. Ct. 1109, 30 L. Ed.
228, this court said (page 381, 118 U. S. page 1112, 6 Sup. Ct.,
and page 228, 30 L. Ed.); "With the Indians themselves these
relations are equally difficult to define. They were, and always
have been, regarded as having a semi-independent position
when they preserved their tribal relations; not as states, not as
nations, not as possessed of the full attributes of sovereignty,
but as a separate people, with the powers of regulating their
internal and social relations, and thus far not brought under
the laws of the Union, or of the state within whose limits they
resided." True it is that in many adjudications of this court
the fact has been fully recognized that, although possessed of
these attributes of local self-government when exercising their
tribal functions, all such rights are subject to the supreme
legislative authority of the United States. Cherokee Nation
vs Southern Kansas R. Co., 135 U. S. 641, 10 Sup. Ct. 965, 34
L. Ed. 295, where the cases are fully reviewed. But the exis-
tence of the right in congress to regulate the manner in which
the local powers of the Cherokee Nation shall be exercised does
not render such local powers federal powers arising from and
created by the constitution of the United States. It follows
that, as the powers of local self-government enjoined by the
Cherokee Nation existed prior to the constitution, they are
not operated upon by the fifth amendment, which, as we have
said, had for its sole object to control the powers conferred by
the constitution on the national government. The fact that the
Indian tribes are subject to the dominant authority of congress,
and that their powers of local self-government are also operated
upon and restrained by the general provisions of the constitu-

tions of the United States, completely answers the argument of inconvenience which was pressed in the discussion at bar. The claim that the finding of an indictment by a grand jury of less than thirteen violates the due process of the fourteenth amendment is conclusively answered in Hurtado vs California 110 U. S. 516, 4 Sup. Ct. 292, 28 L. Ed. 232, and McNulty vs Same 149 U. S. 645, 13 Sup. Ct. 959, 37 L. Ed. 882. The question whether a statute of the Cherokee Nation, which was not repugnant to the constitution of the United States or in conflict with any treaty or law of the United States, had been repealed by another statute of that nation, and the determination of what was the existing law of the Cherokee Nation at to the constitution of the grand jury, were solely matters within the jurisdiction of the courts of that nation, and the decision of such a question in itself necessarily involves no infraction of the United States. Such has been the decision of this court with reference to similar contentions arising upon an indictment and conviction in a state court, In re Duncan, 139 U. S. 449, 11 Sup. Ct. 573, 35 L. Ed. 219. The ruling in that case is equally applicable to the contentions in this particular arising from the record before us."

"We have quoted thus extensively from the opinion in this case for the reason that it is one of the most recent utterances of the supreme court, and it clearly points out the relation which exists between the Five Civilized Tribes and the United States. The most recent case, however, which has been decided by the supreme court which directly applies to citizenship in the Indian Territory is the case of A. B. Roff against Louisa Burney, administratrix of B. C. Burney, deceased. The decision in this case was handed down November 29, 1897, and is published in the advance sheets of the opinions of the Supreme Court of the United States, December 15, 1897, pp. 94-96; also 168 U. S. 218, 224, 18 Sup. Ct. 60, 42 L. Ed. 442. This case arose in the Indian

Territory and involved the question of jurisdiction which turned upon the citizenship of the parties in the suit. It seems that the Chickasaw Nation passed an act October 7, 1876, conferring the right of citizenship on Wm. H. Bourland, Amanda, Matilda, Gordenta, and Run Hanna. By this act, which was simply a confirmation of a prior statute, passed in 1857, the parties therein became adopted citizens of the Chickasaw Nation. The plaintiff in this case, Roff, was married to Matilda Bourland while she was an adopted citizen, and under the Chickasaw law this made him a citizen of the Chickasaw Nation by adoption. Thereafter, on October 11, 1883, which was seven years after the first act was passed, the legislature of the Chickasaw Nation passed another act, as follows: (sections 1, 2): 'Be it enacted by the legislature of the Chickasaw Nation that the right of citizenship granted to the following named children and nephews of W. H. Bourland, Amanda, Matilda, Gordenta and Run Hannah approved Oct. 7, 1876, be and the same is hereby repealed and annulled. Be it further enacted, that the governor is hereby directed and required to remove said parties and their descendants beyond the limits of this nation, and that this act takes effect from and after its passage.' Since the passage of this last-named act the Chickasaw government, and all the officials thereof, have refused to recognize the plaintiff, Roff, as a member of the Chickasaw tribe, and the courts have refused to entertain jurisdiction of any controversy between him and any member of the tribe. In the statement of the case by Justice Brewer, he called attention to article 7, of the treaty of June 22, 1855, between the United States and the Choctaw and Chickasaw tribes (11 Stat. 612), as follows: 'So far as may be compatible with the constitution of the United States and the laws made in pursuance thereof regulating trade and intercourse with the Indian tribes, the Choctaws and Chickasaws shall be secured in the unrestricted right of self-government, and full jurisdiction over persons and property, within their

respective limits; excepting however all persons, with their property, who are not by birth, adoption or otherwise citizens or members of either the Chickasaw or Choctaw tribe.' Article 38 of the treaty with the same tribes, of date April 28, 1866, provides (14 Stat. 779.): 'Every white person who, having married a Choctaw or Chickasaw resides in the said Choctaw or Chickasaw Nation, or who has been adopted by the legislative authorities, is to be deemed a member of said nation, and shall be subject to the laws of the Choctaw and Chickasaw Nations according to his domicil, and to prosecution and trial before their tribunals, and to punishment according to their laws in all respects as though he was a native Choctaw or Chickasaw.' Mr. Justice Brewer delivered the opinion of the court in this case, which appears to be the unanimous opinion of the court no one dissenting. Special attention is called to the following extracts from this opinion: 'While the Indians and the territory which may have been specially set apart for their use are subject to the jurisdiction of the United States, and congress may pass such laws as it sees fit prescribing the rules governing the intercourse of the Indians with one another and with citizens of the United States and also the courts in which all controversies to which an Indian may be a party shall be submitted (U. S. vs Rogers, 4 How. 567, 11 L. Ed. 1105; U. S. vs Kagama, 118 U. S. 375, 6 Sup. Ct. 1109, 30 L. Ed 228; Ex parte Gonshay-ee 130 U. S. 343, 9 Sup Ct. 542, 32 L. Ed.. 973; Cherokee Nation, vs Southern Kansas R. Co., supra) the mere fact that a citizen of the United States has become a member of an Indian tribe by adoption may not necessarily cancel his citizenship. As said by Chief Justice Taney, in U. S. vs Rogers, supra (page 573), "Whatever obligations the prisoner may have taken upon himself by becoming a Cherokee by adoption, his responsibility to the laws of the United States remained unchanged and undiminished." Indeed, by section 43 of the act of May 2, 1890, (26 Stat. 99, c. 182), provision is made for the naturalization of

(35)

members of the Indian tribes in the Indian Territory, with a proviso "that the Indians who become citizens of the United States under the provisions of this act do not forfeit or lose any rights or privileges they enjoy or are entitled to as members of the tribe or nation to which they belong." Now, according to his complaint, plaintiff was a citizen of the United States. Matilda Bourland was not a Chickasaw by blood, but one upon whom the right of Chickasaw citizenship had been conferred by an act of the Chickasaw legislature. The citizenship which the Chickasaw legislature could confer it could withdraw. The only restriction on the power of the Chickasaw Nation to legislate in respect to its internal affairs is that such legislation shall not conflict with the constitution or laws of the United States, and we know of no provision of such constitution or laws which would be set at naught by the action of a political community like this in withdrawing privileges of membership in the community once conferred. The Chickasaw legislature, by the second act, whose meaning is clear, though its phraseology may not be beyond criticism not only repealed the prior act, but canceled the rights of citizenship granted thereby, and further directed the governor to remove the parties named therein and their descendants beyond the limits of the nation. This act was not one simply taking effect as of the date of its passage, and then withdrawing rights admitted to have been theretofore legally granted, but was retroactive in its scope, and purported to annul and destroy all that had ever been attempted to be done in respect to the matter. Whether any rights of property could be taken away by such subsequent act need not be considered. It is enough to hold that all personal rights founded on the mere status created by the prior act fell when that status was destroyed. Doubtless, by intermarriage, with one who was at the time by legislative act a Chickasaw citizen, he acquired the rights and privileges of a member of that tribe or nation; but when that which was the foundation upon which such acquisition rested

was taken away by act of the nation, then all of those rights and privileges ceased. The tie which bound him to the nation was his wife's citizenship. That tie the nation destroyed. Its destruction released him. That such was the effect of this legislative act is established by the conduct of the Chickasaw government and all its officials, for they have refused to recognize plaintiff as any longer a member of the Chickasaw Nation, and the courts of that nation have declined to entertain jurisdiction of any suits brought by him against a Chickasaw. The validity of the act withdrawing citizenship from the wife of plaintiff and the consequent withdrawal from plaintiff of all the rights and privileges of citizenship in the Chickasaw Nation, has been practically determined by the authorities of that nation, and the determination is not subject to correction by any direct appeal from the judgment of the Chickasaw courts."

"From the above-mentioned opinions of the supreme court of the United States, the following conclusions are established:

"First. That, while the Five Civilized Tribes in the Indian Territory are all subject to the paramount authority of the United States, yet, in so far as the power of these tribes or nations to legislate respecting their own citizens and property is concerned, they are entitled to the unrestricted right of self-government; and their right to legislate respecting all persons belonging to the tribe, and their property, in any manner which they may see fit, subject only to the constitution of the United States, the treaties made with the tribes, and the laws of congress, is conceded.

"Second. That the same faith and credit are to be given to the proceedings of the legislature of the several tribes, and to the proceedings and judgments of the courts of the several tribes, as are given to similar proceedings of the legislatures and the courts in the states and territories of the Union.

"It follows, therefore, that the act of the Choctaw council denying and rejecting the application of the claimants in this case to citizenship in the nation is final, and conclusive upon this court. The council represents the highest power of the nation. It might act directly upon applications for citizenship, or it might create tribunals for that purpose. If it acts directly, as in the case at bar, its jurisdiction over the subject matter is unquestioned. It has the right to determine who shall be and who shall not be citizens of the nation. In deciding the application of the claimants in this case adversely to their right, the Choctaw council must have determined that the descendants of Abigail Rogers were not entitled on account of such descent to citizenship in that nation. It follows, conclusively, that those who have intermarried with such descendants have not by such intermarriage become citizens of the nation.

"The question has been raised as to whether all persons who claimed citizenship by reason of being descendants of Abigail Rogers were parties to the case which was decided by the Choctaw council, and, if not parties to that case, it is contended by counsel that they are not bound by the decision in the case which was passed upon by the council. It is stated in the papers in the case that all the parties who claimed by virtue of descent from Abigail Rogers agreed to consolidate their claims into one case, and that all would abide the decision in that case. The text of this agreement is not to be found in the record. However, we have a right to conclude that the Choctaw council definitely held that the descendants of Abigail Rogers were not, by reason of such descent, entitled to citizenship in the Choctaw Nation. Whether this decision was reached in a case in which all of the descendants were parties is not material, so far as this court is concerned. It is sufficient to know that the Choctaw council has held that the descendants of Abigail Rogers are not entitled to citizenship by reason of

their descent from her. This decision of the Choctaw council is binding upon this court as to such descendants of Abigail Rogers as may not have been parties to the case which was passed upon by the council. The decision in that case was equivalent to an act of council stating that the descendants of Abigail Rogers were not entitled, by reason of such descent, to citizenship in the Choctaw Nation. Such decision, although not between the same parties, is so far persuasive upon this court that it would be manifestly unjust to disregard it. This court is therefore of the opinion, and so decides, that the descendants of Abigail Rogers, by reason of such descent, and those who have intermarried with them, are not entitled to citizenship in the Choctaw Nation. The judgment of the United States commission rejecting their claim is therefore affirmed, and their application to be enrolled as citizens of the Choctaw Nation is denied."

From the judgment of affirmance they appealed to the United States supreme court, which appeal was dismissed. They then presented their petition for a writ of mandamus to compel the judge of the United States court for the Central District of the Indian Territory to hear their application for enrollment as citizens of the Choctaw Nation. To this petition for a mandamus the respondent demurred on the grounds that the court had no jurisdiction to grant the writ, and that the petition did not contain facts sufficient to authorize the issuance of the writ.

*T. N. Foster*, for petitioners.

*Mansfield, McMurray & Cornish*, for respondent.

RAYMOND, J. This is a petition for a writ of mandamus to compel Hon. William H. H. Clayton, as judge of the United States court for the Central district of the Indian Territory, to try the cause of petitioners upon their application to be enrolled

as citizens of the Choctaw Nation, filed in this court September 5, 1901. Upon careful reading of the petition filed herein, it will be difficult to see upon what ground it can be granted. The petitioners allege that they filed their petition to be enrolled as citizens of the Choctaw Nation before the Dawes commission; that there was a hearing upon this petition, and a decision adverse to them; that thereupon they appealed to the United United States court of the Central district of the Indian Territory, and there was an adverse decision in that court; that they thereupon appealed to the supreme court of the United States, and that their petition was dismissed for noncompliance with a well-established rule of that court on the 23d day of March, 1900. It cannot be denied but that Justice Clayton, when he found a case in his court for trial, upon one side of which he had once been of counsel, could ask one of the other judges of the United States court for the Indian Territory to sit in his district, and try the cause. The act of March 1, 1895, being "An act to provide for the appointment of additional judges of the United States court in the Indian Territory and for other purposes" (28 Stat. 694, c. 145, § 2; Ind. Ter. St. 1899, § 46), provides; "The judge of each district is authorized and empowered to hold court in any other district for the trial of any case which the judge of such other district is disqualified from trying. * * * And whenever, on account of sickness, or for any other reason, the judge of any district is unable to perform the duties of his office, either of the other judges may act in his stead, in term time or in vacation." Judge Springer at that time was one of the judges of the United States court of the Indian Territory and there was no impropriety in Judge Clayton asking Judge Springer to come to the Central District, and hear said cause; nor was any rule of law violated. If it be conceded that the decision of Judge Springer was erroneous, that would be no ground for the allowance of this petition. Petitioners, not being satisfied with the decision of Judge Springer in the

case, appealed to the Supreme Court of the United States, and there permitted their appeal to be dismissed.

The demurrer is sustained, and petition is dismissed, at cost of petitioners.